**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| **ONEUNITED BANK,** ) | |
| ) | |
| **Creditor-Appellant,** ) | |
| ) | |
| **v.** ) | **Bankruptcy Appeal No.** |
| ) | **12-12134-NMG** |
| **CHARLES STREET AFRICAN METHODIST** ) | |
| **EPISCOPAL CHURCH OF BOSTON,** ) | |
| ) | |
| **Debtor-Appellee.** ) | |
| ) | |

**MEMORANDUM & ORDER**

**GORTON, J.**

Appellant OneUnited Bank ("OneUnited" or "the Bank")
negotiated two mortgage loans with appellee Charles Street
African Methodist Episcopal Church of Boston ("CSAME"), upon
which CSAME ultimately defaulted.  When the Bank sought to
foreclose upon the mortgaged properties, CSAME filed a Chapter
11 petition in the Bankruptcy Court of this District.  The Bank
subsequently filed a proof of claim and moved to dismiss the
bankruptcy petition.  CSAME objected to both and the Bankruptcy
Court entered orders denying the Bank's motion to dismiss and
sustaining CSAME's objection to the Bank's claim.  Currently
pending before the Court is the Bank's consolidated appeal of
both orders.

I.   **Facts**

   A.   **The African Methodist Episcopal Church and the Book of Discipline**

   The African Methodist Episcopal Church ("the National Church") was formed in Philadelphia, Pennsylvania in 1816.  By its own nomenclature, the National Church is a "connectional" church in which its local churches are connected through a network of church groups which rely upon one another to accomplish the purposes of the National Church.  The groupings are derived from the organizing document of the National Church, known as the Book of Discipline ("the Book").  In particular, local churches within a geographic region send representatives to an "Annual Conference," which is both an incorporated entity and a meeting.  Conferences are, in turn, organized into Episcopal Districts, of which there are 20 throughout the country, each presided over by a bishop.  The First Episcopal District, of which CSAME is a member, consists of 330 local churches.

   Part III of the Book governs the property rights of the National Church and its connectional churches, of which CSAME is one.  In Part III, the Book establishes what is called the "In Trust Rule," which provides that the "title to all real, personal and mixed property" owned by the conferences and chapters "shall be held in trust for" the African Methodist

Episcopal Church, Incorporated ("AMECI").  In particular, the
Book specifies that title in such property vests in AMECI when a
church is disbanded.  AMECI is a non-profit entity that was
incorporated in Pennsylvania in 1936 and, apart from "holding in
trust" all property of the local churches, appears principally
charged with representing and protecting the same property
rights in legal proceedings.

      **B.**   **CSAME**

Appellee CSAME was incorporated, under another name, by act
of the Massachusetts General Court in January, 1839.  CSAME has
remained continuously incorporated in Massachusetts since that
time and currently has no plans to disaffiliate from the
National Church.

At present, CSAME has approximately 1,000 active members
and employs both religious and administrative staff.  It
conducts regular worship services, provides pastoral care and
religious education and engages in a variety of other charitable
activities.  It raises money through congregational giving which
it uses to support regular programming and to pay other
expenses.  It also owns and maintains property, some of which it
has sought to develop.  Notably, CSAME has borrowed money from
appellant OneUnited in order to finance a community center, to
be operated as a separate, non-profit entity called the Roxbury
Renaissance Center ("the RRC").

C.    **The Church and Construction Loans**

In October, 2006, CSAME obtained two loans from OneUnited. The first loan, with a principal of $1.115 million at a fixed 7.875% interest rate over five years ("the Church Loan"), refinanced then-existing loan obligations to other banks.  The second loan, with a principal of $3.652 million and an 18-month maturity date ("the Construction Loan"), was negotiated for the purpose of rehabilitating a vacant building into the RRC.  The Construction Loan accrued interest at a floating "prime" rate of not less than 7% nor more than 14%.  Both Loans provided for default interest rates at the greater of 18% or the then current "prime" rate, plus 5%.

Both Loans were secured by mortgages upon real estate owned by CSAME, including the main church building in which CSAME conducts religious services.  The Book requires local churches to obtain the approval of the Quarterly and Annual Conferences of which the local church is a member before that church is permitted to encumber or transfer property.  CSAME obtained such approval for the mortgages associated with the subject Loans.

As a condition required by OneUnited, CSAME persuaded the First Episcopal District both to guarantee the Construction Loan and to issue a certificate of deposit, in the amount of $850,000, to ensure that CSAME could meet its monthly service payments.  In a footnote to a financial statement submitted in

support of its guarantee, the First District asserted that the
Bishop had the authority to transfer funds between organizations
and among local churches.  During an evidentiary hearing
conducted by the Bankruptcy Court with respect to the instant
dispute, witnesses from CSAME and the First Episcopal District
questioned whether such authority existed within the Book and
claimed that, in practice, any bishop attempting to exercise
authority over funds from a local church would meet resistance.

       During that hearing, the Chief Operating Officer of
OneUnited, Ms. Teri Williams, explained in general terms how the
Bank establishes interest rates on its loans.  When setting the
default interest rates on loans, OneUnited considers the risk
associated with the loan, the increased internal and external
costs associated with a loan in default and the prevailing
market rate.  Ms. Williams did not offer testimony concerning
how OneUnited's practices focused on the specific
characteristics of the Loans in this case.  She did testify,
however, that 1) the Bank did not determine what specific
default interest rate to charge in case of default but rather
used risk as a factor to determine whether the loans in general
would include a default interest rate at all and 2) OneUnited
applied an 18% minimum default interest rate on a number of
commercial loans between 2004 and 2007.

Based upon testimony at the subject hearing, the Bankruptcy
Court drew several conclusions: (1) the Bank considered a
default interest rate at the floating prime rate plus 5% to be
sufficient to cover its increased costs; (2) the default
interest rate was generally applicable and OneUnited did not
separately calculate the rate for the two Loans at issue; and
(3) OneUnited set an 18% minimum rate simply because it believed
that the market would bear that rate.

### D.   Defaults by CSAME

Although construction on the RRC began in November, 2006,
the project became plagued by prolonged delays and was not
finished by the time that the Construction Loan became due in
June, 2008.  After several extensions, OneUnited formally
declared an event of default in April, 2010, at which point the
Construction Loan began accruing interest at the default rate of
18%.  When the Church Loan matured in December, 2011, CSAME was
unable to make the required balloon payment, causing OneUnited
to declare an event of default on that loan as well.  Interest
has also accrued on that loan at the rate of 18% since default.
In order to avert imminent foreclosure upon its properties,
including the building in which it conducts religious services,
CSAME filed a Chapter 11 bankruptcy petition in March, 2012.

## II.   **Procedural History**

When CSAME filed its Chapter 11 petition in March, 2012, it filed a plan of reorganization at the same time.  In May, 2012, OneUnited filed a motion to dismiss the Chapter 11 petition pursuant to 11 U.S.C. § 1112(b)(1), asserting that CSAME was not an eligible debtor under the Bankruptcy Code ("the Code").  The following month, while that motion remained pending, the Bank filed its proof of claim, asserting an outstanding balance on both loans which, including the interest that had accrued at the default rate, totaled approximately $5 million.  CSAME objected. In August, 2012, the Bankruptcy Court held an evidentiary hearing on both the motion and CSAME's objection to the Bank's proof of claim.

In September, 2012, in separate, thoughtful opinions the Bankruptcy Court denied the motion to dismiss the petition and sustained CSAME's objection to OneUnited's claim.  Chief Bankruptcy Judge Frank J. Bailey declined to dismiss the petition because, after addressing the myriad arguments offered by the Bank in support, he concluded that CSAME is a corporation within the meaning of 11 U.S.C. § 101(9) or, alternatively, at least an entity sharing in the privileges of a corporation.  He sustained CSAME's objections to the proof of claim on the grounds that the default interest provisions contained within the Church and Construction Loans were not reasonable forecasts

-7-

of OneUnited's damages in the event of a default and therefore operated as unenforceable penalties.  OneUnited filed timely separate appeals of both orders in this Court which later granted leave to consolidate.

## III. __Analysis__

United States district courts have jurisdiction to hear appeals from final orders of bankruptcy courts. See 28 U.S.C. § 158.  In reviewing an appeal from an order of a bankruptcy court, a district court reviews de novo conclusions of law but must accept the bankruptcy judge's findings of fact unless they are clearly erroneous. TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995).

### A.   Should the Bankruptcy Court have Dismissed CSAME's Chapter 11 Petition "for cause"?

On appeal, OneUnited argues that the Bankruptcy Court should have dismissed the Chapter 11 petition filed by CSAME "for cause" because (1) CSAME is not an eligible debtor under the the Code and, relatedly, (2) CSAME filed its bankruptcy petition in bad faith.

### 1.   Dismissal under 11 U.S.C. § 1112(b)(1)

Pursuant to 11 U.S.C. § 1112(b)(1), bankruptcy courts may dismiss Chapter 11 petitions "for cause." In re Capitol Food Corp. of Fields Corner, 490 F.3d 21, 24 (1st Cir. 2007).  The Code defines several examples of "cause" to dismiss, including a

-8-

debtor's inability to effectuate a plan of reorganization and the continuing diminution of the bankruptcy estate without a reasonable likelihood of its rehabilitation. In re Victoria Ltd. P'ship, 187 B.R. 54, 59-60 (Bankr. D. Mass. 1995).

Courts have noted that the "causes" identified in the Code are not exhaustive and have recognized other grounds for the dismissal of a Chapter 11 petition.  One such cause is the ineligibility of the entity for debtor status.  Any entity that is eligible to be a debtor under Chapter 7 of the Code, e.g. a corporation, may be an eligible debtor under Chapter 11. See 11 U.S.C. §§ 109(d), 101(41).

Business trusts are also eligible debtors but nominee trusts, as defined under Massachusetts law, are not because they hold only bare legal title and do not conduct business except at the direction of their beneficiaries. See In re Vill. Green Realty Trust, 113 B.R. 105, 113-15 (Bankr. D. Mass. 1990).  The determinative consideration in such cases is not the title of the entity but rather "what the debtor actually is and the purpose it has been created to carry out." Id. at 114 (internal quotation omitted); see also In re Gonic Realty Trust, 50 B.R. 710, 714 (Bankr. D.N.H. 1985) (concluding that debtor trust could file Chapter 11 petition because debtor was conducting a "business operation" and was something more than holding entity).  Bankruptcy courts have been reluctant to permit

-9-

beneficiaries of nominee trusts to shield their personal assets from creditors by filing bankruptcy petitions in the names of trusts. See In re Colbran, LLC, 475 B.R. at 297 (quotation and citation omitted).

Determining the existence of a nominee trust is a fact-intensive inquiry but courts have noted that nominee trusts "are frequently seen as agents for the principals' convenience." Apahouser Lock & Sec. Corp. v. Carvelli, 528 N.E. 2d 133, 135 (Mass. App. Ct. 1988).  Other traits of nominee trusts are that 1) they do no any "business," 2) the beneficiaries have exclusive power to direct the trustee, 3) they can be terminated at any time without permission of the trustee and 4) they are created merely to preserve assets. See In re Vill. Green Realty Trust, 113 B.R. at 113-14; In re Colbran, LLC, 475 B.R. at 297; In Re Medallion Realty Trust, 103 B.R. 8, 11-12 (Bankr. D. Mass. 1989).

 Another such cause for dismissal, although perhaps more debated within the case law, is the filing of a petition in bad faith.  The First Circuit Court of Appeals has expressly declined to decide whether Chapter 11 incorporates an implicit requirement that petitions be filed in "good faith" or that a filing in bad faith requires dismissal under Section 1112(b)(1). See In re Capitol Food Corp., 490 F.3d at 24.  As noted in a First Circuit opinion, however, even courts that do recognize a

good faith requirement impose a prima facie burden on the party
seeking dismissal to demonstrate that the debtor filed the
petition in bad faith. See id.  Although the First Circuit did
not delineate the contours of the prima facie burden placed upon
the entity seeking dismissal of the petition, it intimated that
petitions filed in response to "catastrophic business events,"
such as imminent foreclosures, are typically filed in good
faith. See id. at 25.  Similarly, the First Circuit noted that
merely evincing the debtor's desire to "frustrate creditors"
does not alone demonstrate "bad faith" because the Code
recognizes the need for a "breathing spell" as a proper purpose
to file a petition. See id.

### 2.  Application

For substantially the same reasons expressed by the
Bankruptcy Court, this Court concludes that dismissal of the
Chapter 11 petition is not warranted by the additional causes
advanced by OneUnited and will therefore affirm the Bankruptcy
Court's order denying OneUnited's motion to dismiss.  CSAME's
status as a corporation under Massachusetts law renders it an
eligible debtor and, even if that fact were not dispositive,
CSAME's policies and conduct confirm that it is not merely a
"shell" to hold property for the National Church.

It is undisputed that CSAME, by act of the Massachusetts
legislature, is a corporation under Massachusetts law and

-11-

possesses all of the privileges to which private corporations
are entitled. See M.G.L.c. 67, § 40.  That fact renders
inapposite the precedent cited by OneUnited in support of its
claim that CSAME is not an eligible debtor because those cases
involved debtors organized as trusts, rather than as
corporations. See In re Colbran, LLC, 475 B.R. at 295-96
(nominee trust); In re Vill. Green Realty Trust, 113 B.R. at 114
(same); In re Gonic Realty Trust, 50 B.R. at 714 (real estate
trust); In re Dolton Lodge Trust No. 35188, 22 B.R. 918, 922
(Bankr. N.D. Ill. 1982) (land trust).

    The Bankruptcy Court found CSAME's incorporation
dispositive of OneUnited's remaining arguments.  There is no
precedent, however, for the proposition that corporate entities
are, a fortiori, eligible debtors under Chapter 11.  The Court
will therefore consider the import of OneUnited's argument that
CSAME operated essentially as a nominee trust by virtue of the
"In Trust Rule" and other dictates of the Book.  The Court
assumes, in that regard, without deciding, that the First
Amendment does not prohibit it from referring to the Book to
assess OneUnited's claim.

    Even acknowledging that the Book renders CSAME a trustee
holding the National Church's property in trust does not,
however, render CSAME a nominee trust and, therefore, an
ineligible debtor.  The evidence considered by the Bankruptcy

-12-

Court demonstrates that CSAME, a non-profit corporation, is actually anything but a "shell" merely holding assets at the exclusive direction of the National Church. See In re Colbran, LLC, 475 B.R. at 297; In re Vill. Green Realty Trust, 113 B.R. at 114.

As the Bankruptcy Court explained, CSAME raises funds through contributions from its membership, employs and pays religious and administrative staff, provides pastoral care and religious education and engages in a variety of charitable activities. See In re Treasure Island Land Trust, 2 B.R. 332, 334 (Bankr. Fla. 1980) ("The basic distinction between business trusts and nonbusiness trusts is that business trusts are created for the purpose of carrying on some kind of business."). Perhaps most important, the impetus for the RRC project originated with CSAME and CSAME instigated the subject loans on its own. Cf. In re Vill. Green Realty Trust, 113 B.R. at 114 (explaining that the beneficiaries of a nominee trust "have the exclusive power to direct the activities of the trustee" (emphasis added)).  Although CSAME obtained approval from the Quarterly and Annual Conferences in order to mortgage its property, the fact that CSAME was the moving force behind the project demonstrates that it was not merely acting as an agent of the alleged beneficial owners of the assets in bankruptcy. See In re Colbran, LLC, 475 B.R. at 291 (debtor nominee trust

-13-

acted solely at the discretion of beneficiary); <u>In re Vill.
Green Realty Trust</u>, 113 B.R. at 115 (debtor trust held single
asset and trust's filing apparently reflected dispute between
the trust principal and another entity).

OneUnited's argument based upon CSAME's purported failure
to file the petition in good faith is similarly unavailing
because it fails to make a prima facie showing that CSAME filed
its Chapter 11 petition in bad faith.[1]  Although the First
Circuit has declined to recognize or reject the "good faith"
doctrine, it has placed the burden on entities asserting the
doctrine to make a prima facie showing that the debtor filed in
bad faith. <u>See</u> <u>In re Capitol Food Corp.</u>, 490 F.3d at 24-25.

When CSAME filed its Chapter 11 petition, it faced imminent
foreclosure upon its properties, including the main church
property on which CSAME conducts religious services.
Foreclosure upon that property would undoubtedly have interfered
with CSAME's continued operations, including its 1) provision of
charitable services, 2) ability to raise money in support of
those initiatives and 3) requirement to repay its obligations
under the Loans.

---

[1] Although OneUnited's arguments in support of dismissal have
evolved since they were proffered in the Bankruptcy Court, the
"good faith" doctrine is sufficiently related to the question of
CSAME's eligibility to be a debtor to render it within the scope
of legitimate review here.

In sum, CSAME was faced with a "catastrophic business event" that threatened to disrupt its ongoing operation while its "going concern value" remained higher than its liquidation value.  Under the circumstances, CSAME's petition was designed to further the two principal purposes of Chapter 11 petitions, namely, the preservation of going concerns and the maximization of property available to satisfy creditors. Id. at 25 (citation omitted).  Accordingly, OneUnited has not shown that CSAME lacked a valid purpose for filing its Chapter 11 petition or that the petition was filed in bad faith. See id. at 25 (finding no bad faith because, under similar circumstances, debtor had present need for reorganization).

OneUnited argues that CSAME's proposed plan of reorganization, submitted simultaneously with its petition, demonstrates CSAME's bad faith because the plan seeks to extend the maturity date significantly and to obtain a release of First District's guarantee of the loan.  Although it submits persuasive authority for the proposition that, at least in other circuits, third-party releases are disfavored in bankruptcy, OneUnited adduces no authority for the proposition that the mere inclusion of a third-party release warrants dismissal of the petition for bad faith.  To the extent that the contents of the proposed plan are unfair, or contain impermissible provisions, such arguments do not require dismissal of a petition at the

-15-

time of its filing. See Carolin Corp. v. Miller, 886 F.2d 693, 700 (4th Cir. 1989) ("Decisions denying access at the very portals of bankruptcy...are inherently drastic and not lightly to be made."). That is particularly true where a bankruptcy court is expressly authorized by the Code to dismiss a Chapter 11 petition based upon inadequacies of the debtor's proposed plan of reorganization. If, for example, the bankruptcy court later determines there is no reasonable likelihood of rehabilitation or that the debtor will be unable to effectuate a plan, it can so find. See In re Victoria Ltd. P'ship, 187 B.R. at 59-60.

Finally, the record lacks other evidence indicative of bad faith. There is no suggestion that CSAME's petition contained inaccurate or misleading statements designed to conceal property from its creditors in bankruptcy, see Marrama, 549 U.S. at 368-69, or that the petition was merely filed to gain a tactical advantage during ongoing litigation. See, e.g., In re SGL Carbon Corp, 200 F.3d 154, 163, 166 (3d Cir. 1999) (debtor filed for Chapter 11 despite being able to meet its debts and not requiring reorganization).

**B.    Should the Bankruptcy Court have Sustained CSAME's Objection to OneUnited's Proof of Claim?**

On appeal, OneUnited argues that the Bankruptcy Court erred by placing the burden of proving the proportionality of the

default interest rate upon OneUnited rather than upon CSAME and
that, irrespective of the proper burden, the default interest
provisions are enforceable.

### 1.   Objections to Proof of Claim and Default Interest Rates

Resolution of an objection to a proof of claim in
bankruptcy follows a burden-shifting framework.  A proof of
claim submitted in accordance with Fed. R. Bank. P. 3001(f)
constitutes prima facie evidence of that claim's validity. In re
Hemingway Transp., Inc., 993 F.2d 915, 925 (1st Cir. 1993).  If
an objection to the claim is filed, the objecting party must
adduce "substantial evidence" to rebut the presumption in favor
of the properly filed claim, at which time the ultimate burden
of persuasion rests with the party asserting the claim. Id.

CSAME objected to OneUnited's claim on the basis that the
default interest rate applied constitutes an unenforceable
penalty under Massachusetts law.  The Massachusetts Supreme
Judicial Court ("the SJC") recently explained the relevant legal
principles applicable to that question:

> first, that at the time of contracting the actual
> damages flowing from a breach were difficult to
> ascertain; and second, that the sum agreed on as
> liquidated damages represents a reasonable forecast of
> damages expected to occur in the event of a breach.
> Where damages are easily ascertainable, and the amount
> provided for is grossly disproportionate to actual
> damages or unconscionably excessive, the court will
> award the aggrieved party no more than its actual
> damages.

-17-

NPS, LLC v. Minihane, 886 N.E.2d 670, 673-74 (Mass. 2008)
(internal quotation marks and citations omitted).  The burden of
proving unenforceability rests with the party challenging the
default interest rate, namely, the debtor, and a reviewing court
resolves any doubts in favor of the aggrieved party, namely, the
lender. Id. at 673.  Because there is no bright line separating
a reasonable measure of damages from an unenforceable penalty,
the reasonableness of the measure of anticipated damages depends
upon the facts and circumstances of each case. Id. at 673-74.

### 2.  Application

Because this Court concludes that CSAME did submit
substantial evidence in support of its objection to OneUnited's
proof of claim and that, in any event, the default interest rate
provisions contained in the Loans operated as unenforceable
penalties, the Court will affirm the Bankruptcy Court's order
denying prepetition and postpetition interest on the basis of
those default interest provisions.

CSAME concedes that OneUnited's damages in the event of
default are difficult to ascertain and, therefore, in order to
adduce "substantial evidence" in support of its objection to
application of the default interest rates, CSAME is required to
submit evidence showing that the default interest rate
provisions are not "reasonable forecasts" of the Bank's
anticipated damages.

Contrary to the Bank's assertions, CSAME did submit such "substantial evidence."  Specifically, CSAME submitted the following exhibits: 1) the promissory notes of both Loans, 2) a letter from OneUnited approving the material terms of the Loans and 3) a chart of the prime interest rate over time.  CSAME used that evidence to demonstrate that: a) OneUnited applies the same default rate to both Loans which have different principal amounts, interest rates and maturity dates; b) OneUnited is willing to accept a default interest rate of prime plus 5% except when the prime rate exceeded 13% but otherwise accepts no less than 18% in the event of default; c) the default interest rate is not the product of negotiation between the parties; and d) the prime rate was approximately 8% at the time of contracting and had not exceeded 13% since 1981, about 25 years before the parties negotiated the Loans.

Based upon that evidence, the Bankruptcy Court could (and did) conclude that the default interest rate was not a reasonable forecast of the Bank's damages because the default rate has nothing to do with the Bank's estimated costs.  As the Bankruptcy Court explained, the default rate varies with the prime rate, so that the Bank collects no less than an additional 5% upon default (in the unlikely event that the prime rate exceeds 13%) but can collect an additional 10% or more upon default when the prime rate is 8% or less.

-19-

The additional margin requires justification from OneUnited because it is not tethered to preserving the Bank's benefit of the bargain. Cf. NPS, 886 N.E.2d at 421-22 (upholding acceleration clause as valid liquidated damages provision because it required no more than what defendant would have been required to pay over life of the agreement). That is particularly true because, at the time of contracting, the applicable 18% default interest rate was more than double the contract interest rates of the Construction and Church Loans (approximately 8% and 7.8% respectively). Cf. De Cordova v. Weeks, 140 N.E. 269, 270-71 (Mass. 1923) (refusing to enforce default interest provision that doubled contract rate, from 18% to 36%). Accordingly, CSAME submitted "substantial evidence" in support of its objection to the default interest rate.

Rather than rebut CSAME's objection, the evidence offered by OneUnited tends to confirm that the default interest rate is not a "reasonable forecast" of the Bank's damages. The testimony of the Bank's Chief Operating Officer demonstrates that the Bank incurred additional administrative costs when a loan enters default but does not explain whether or how the Bank makes any attempt to estimate what those costs are. More to the point, the Bank offers no evidence that the default interest rate applied to the Loans reflects an estimate of what costs the Bank will incur upon default by CSAME.

-20-

The Bankruptcy Court therefore properly concluded that the default interest rate provisions function as a penalty rather than liquidated damages and declined to enforce them. See In re 201 Forest St. LLC, 409 B.R. 543, 567-68 (Bankr. D. Mass. 2009) (declining to enforce high default rate where lender failed to identify how default rates were intended to compensate lender for anticipated losses).

OneUnited makes much out of the Bankruptcy Court's decision to shift the ultimate burden of proof on the legitimacy of the default interest rate provisions from CSAME to OneUnited.  The interplay between the procedural rule governing objections to proofs of claim in bankruptcy and the state common law rule with respect to contract liquidated damages is, admittedly, confusing because the two rules appear to be in conflict: in bankruptcy, if a debtor adduces "substantial evidence" supporting his objection to the creditor's proof of claim, the creditor must prove the legitimacy of that claim, Hemingway Transp., 993 F.2d at 925, but under contract law, if a borrower challenges the operation of a liquidated damages provision, he must prove the invalidity of that provision. NPS, 886 N.E.2d at 673.

Absent controlling guidance from the case law on the subject, this Court finds no flaw in the Bankruptcy Court's decision to apply the traditional proof-of-claim framework. That approach accounts for the burden imposed upon CSAME under

-21-

state common law because the Bankruptcy Court was entitled to conclude that the default interest rate did not reflect a reasonable estimate of OneUnited's costs and operated as a penalty based upon the "substantial evidence" submitted by CSAME alone. Cf. AZ Servicenter, Inc. v. Segall, 138 N.E.2d 266, 268-69 (Mass. 1956) (finding acceleration clause unconscionable based upon the terms of the contract at issue, without consideration of additional evidence).

OneUnited also argues that CSAME was required to adduce evidence that not only was the default interest rate not a "reasonable estimate" of the Bank's costs but also it was "grossly disproportionate" to what a reasonable estimate of those costs would be. CSAME demonstrated, however, based upon the promissory notes themselves, that the 18% default interest rate was more than double the contract interest rates of the Construction and Church Loans, which were approximately 8% and 7.8% at the time of contracting. In that sense, at least, the default interest rate appears to be grossly disproportionate to what OneUnited's benefit-of-the-bargain damages would be.

To the extent the Bank suggests its debtor can only show the interest rate "grossly disproportionate" by first establishing what would be a reasonable estimate of the lender's cost, this Court agrees with CSAME that such a burden is unreasonable because that information lies within the control of

the lender.  Moreover, the Bankruptcy Court's allocation of the burden of proof comports with a recent decision of another session of that court and OneUnited provides no contrary authority. See 201 Forest St., 409 B.R. at 567-68 (supra).

Finally, OneUnited argues that the Bankruptcy Court improperly faulted the Bank for failing to quantify the additional administrative costs it would incur in the event of a breach by CSAME.  That complaint is also unavailing because, as the SJC makes clear, a default interest rate based upon damages that are difficult to ascertain must still be a "reasonable estimate" of the lender's damages. See NPS, 886 N.E.2d at 673.

## ORDER

In accordance with the foregoing, the orders of the Bankruptcy Court are **AFFIRMED** and the consolidated bankruptcy appeal (Docket No. 1) is **DISMISSED**.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge
Dated September 30, 2013